**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| JOSEPH L. BRACKIN on behalf of himself and similarly situated employees, | ) ) ) |  |
|  | ) | Civil Action No. 2:15-cv-04945-GEKP |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| AIR LIQUIDE INDUSTRIAL, U.S., LP, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANT
AIR LIQUIDE INDUSTRIAL U.S., LP'S MOTION FOR SUMMARY JUDGMENT**

At oral argument, Plaintiffs' counsel argued that there was a dispute of fact about whether Air Liquide's On-call policy required the Field Service Technicians ("FSTs") to physically stay at their homes on Fridays.  In support of this argument, Plaintiffs relied on a November 15, 2011 e-mail from Zone Technical Manager Rick Williams (the "E-mail"), which was attached as Exhibit F of their Response to Air Liquide's Motion for Summary Judgment. The record evidence makes clear that the E-mail, which is the sole basis for Plaintiffs' assertion, (1) does not address Air Liquide's On-call policies; (2) is not effective outside of the applicable statute of limitations for Plaintiffs' claims in any event; and (3) did not result in the FSTs *actually* remaining at home.  Therefore, it does not impact the Court's consideration of Air Liquide's Motion.

Turning first to whether the E-mail modified Air Liquide's On-call policies or procedures, a review of the email itself reveals that it did not.  First, the E-mail does not reference On-call time or even include the phrase "On-call."  Second, the subject of the E-mail is "New Cost Savings Measures."  Third, when read in context, the section of the E-mail upon

which Plaintiffs rely, deals only with a measure to reduce overtime, and only requires that the FSTs not perform their typical scheduled work as they otherwise would during core business hours.  As described by Air Liquide's counsel at oral argument,[1] the time at issue in the E-mail did not address On-call time *at all*.  Rather, to reduce overtime, Air Liquide sought to avoid having FSTs under Mr. Williams' supervision perform their scheduled work on Fridays and, instead, have them "be at home" as opposed to at a client's site.  There is simply no indication in the E-mail that the cost savings measures required FSTs to do anything differently during their On-call time.

Even assuming that the E-mail somehow modified Air Liquide's On-call policy, it would have only done so during a period that is not within the statute of limitations for Plaintiffs' claim.  The first sentence of the E-mail plainly states that it is setting forth "new cost saving measures for all of us *through the end of the year*." (Emphasis added.)  Thus, the validity of the E-mail would have only extended through December 31, 2011.[2]  Mr. Brackin filed his Complaint on August 27, 2015.  The statute of limitations for claims under the FLSA is set forth in 29 U.S. Code § 255(a), which requires that all claims be brought within three years after the accrual of the claim.  Here, the earliest date upon which Mr. Brackin[3] could seek relief is August 27, 2012—more than *eight months after* the expiration of the cost-saving measures enunciated in the E-mail.  Therefore, it has no impact on Plaintiffs' claim because its applicability preceded the

---

[1] For the convenience of the Court, Air Liquide attaches the transcript from the September 20, 2016 hearing hereto as Exhibit A.

[2] Pursuant to paragraph 2 of the Court's September 22, 2016 Order, Air Liquide attaches hereto as Exhibit B an index of all evidence in the record, including testimony from the depositions of Kenneth Marple and Paul Coleman, who are not parties to this case, concerning the non-applicability of the E-mail after January 1, 2012.  Air Liquide also includes evidence about the practice of not working on Fridays after working 40 hours in a work week.

[3] Mr. Ciccarelli opted in to this action on February 24, 2016.  Thus, his statute of limitations would go back only to February 24, 2013.

time frame in which Plaintiffs can recover under the FLSA.

Turning now to the Court's question at oral argument as to what the case law says about what impact there is, if any, on Plaintiffs' decision not to stay at home on Fridays notwithstanding a directive to the contrary, the answer is simple: the Court must look to whether the individuals *actually* were able to engage in personal pursuits.  *See Ingram v. County of Bucks*, 144 F.3d 265, 269 (3d Cir. 1998) ("The inquiry ... is not whether the [plaintiffs] are prevented from participating in certain personal activities, but whether they *actually* engage in personal activities during on-call shifts." (internal quotations omitted)(emphasis added)).  When looking at the record evidence, the FSTs were able to engage in a host of personal pursuits, including those like conducting business for Brackin's Plumbing Heating and Air, LLC, traveling to Mr. Ciccarelli's father's house in Cape Cod, and Mr. Coleman's heading down to the New Jersey shore.  The record leaves no dispute that even if the E-mail created a policy that FSTs were expected to be at home on Fridays, they *actually* were able to enjoy personal pursuits notwithstanding the policy.

Plaintiffs' remaining arguments at oral argument focused on there being a dispute of facts about the frequency of Call-outs and whether FSTs could be disciplined as a result of failing to respond to a Call.  Plaintiffs' arguments on these points are as strained as their argument about the import of the November 2011 E-mail.

With respect to the frequency of Call-outs, Air Liquide addressed this point fully on pages 3 to 4 of its Reply Brief.  For purposes of its Motion, Air Liquide accepted as true the frequency alleged by Plaintiffs, even though it was significantly exaggerated from Air Liquide's time records.  Significantly, on this point, Plaintiffs admit in their response to Air Liquide's Motion that "accepting . . . Plaintiff Ciccarelli's testimony, the foregoing frequency of call

evidence does not satisfy the frequencies outlined in cases as being sufficient . . . ."  (ECF 38-1 at pp. 22-23 of 25.)

As for the question of whether FSTs would be disciplined for refusing a Call, Air Liquide addressed this argument on page 2 of its Reply Brief.  Plaintiffs failed to put forth any evidence that they were ever disciplined for failing to respond to a Call.  Indeed, Plaintiffs offered nothing more than speculation about whether they would be disciplined and each acknowledged that they never had.  Mr. Marple confirmed that he was unaware of any FST receiving discipline as a result of failing to respond to a Call.  (Marple Dep. at 58:7-10.)  Thus, there is no dispute that FSTs were not routinely (or even occasionally) disciplined for failing to respond to a Call and Plaintiffs have not provided evidence sufficient to survive summary judgment.

Plaintiffs were free to engage in a host of personal pursuits while On-call.  Their attempts to manufacture a dispute are unavailing.  Each testified that there were no policies restricting their time while on-call and that all they had to do was have their cell phone and be available.  Circuit Courts throughout the country have found that the amount of freedom that the Plaintiffs had while on-call does not warrant treating their on-call time as compensable.  For these reasons, as well as those set forth more fully in Air Liquide's Motion for Summary Judgment and Reply brief, this Court should grant summary judgment in favor of Air Liquide.

Respectfully submitted,

/s/ Paul C. Lantis
_____
Kimberly J. Gost.
Paul C. Lantis
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3131 (f)

Dated: October 7, 2016

# Exhibit A

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   JOSEPH L. BRACKIN on behalf of    :  CIVIL ACTION
     himself and similarly situated    :
 5   employees,                        :
                    Plaintiffs,        :
 6                                      :
                 vs.                    :
 7                                      :
     AIR LIQUIDE INDUSTRIAL, U.S., LP,  :  NO. 15-CV-04945
 8                                      :
                    Defendant.
 9
                    PHILADELPHIA, PENNSYLVANIA
10
                    SEPTEMBER 20, 2016
11
     BEFORE:        THE HONORABLE GENE E. K. PRATTER, J.
12
                       MOTIONS HEARING
13
     APPEARANCES:
14
                    KRAEMER, MANES & ASSOCIATES LLC
15                  BY:  CHRISTOPHER J. DELGAIZO, ESQUIRE
                    Parkview Tower
16                  1150 1st Avenue, Suite 501
                    King of Prussia, PA  19406
17                  Counsel for Plaintiffs

18                  LITTLER MENDELSON, P.C.
                    BY:  KIMBERLY J. GOST, ESQUIRE
19                  PAUL C. LANTIS, ESQUIRE
                    Three Parkway, Suite 1400
20                  1601 Cherry Street
                    Philadelphia, PA  19102
21                  Counsel for Defendant

22                  KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                    Official Court Reporter
23                  Room 1234 - U.S. Courthouse
                    601 Market Street
24                  Philadelphia, PA 19106
                    (215) 779-5578
25
           (Transcript produced by machine shorthand via C.A.T.)
```

1          (Proceedings commenced at 4 p.m.)

2          THE COURT:  Okay, let's go on the record.  This is

3     the time set aside for oral argument on a motion -- well, two

4     motions, actually, a motion for conditional certification and

5     a motion for summary judgment filed by different parties in

6     the case of Brackin versus Air Liquide Industrial U.S., LP,

7     which is Civil Action 15-4945.

8          If you all would note your presence here for the

9     record, we'll go from there.

10          MS. GOST:  Kimberly Gost for the defendant.

11          MR. LANTIS:  Good afternoon, Your Honor.  Paul

12     Lantis for the defendant.

13          MR. DELGAIZO:  Chris DelGaizo on behalf of the

14     plaintiffs, Joseph Brackin and Tom Ciccarelli.

15          THE COURT:  All right, good to see all of you.

16     Thank you for coming.

17          This is basically a Fair Labor Standards Act case.

18     The Complaint was filed just about a year ago.  There was a

19     motion for the conditional certification and issuance of a

20     notice that was filed in June.  The defense motion for summary

21     judgment was filed in July.

22          Let me just confirm a couple of things on the record

23     here before we go into the argument.  As I understand it, the

24     plaintiffs, both of them, do not oppose the summary judgment

25     motion with respect to Counts Two and Three; is that correct?

1          MR. DELGAIZO:  That's correct, Your Honor.

2          THE COURT:  Okay, so we are going to focus only on

3     Count One with respect to the summary judgment motion.  That's

4     great -- great that we've got that figured out.

5          Am I also correct analytically that depending upon

6     what the result is on the summary judgment motion, there might

7     not be a motion then for a conditional certification?

8          MR. DELGAIZO:  Yes, it does seem that way, Your

9     Honor, the way that the schedule has been set.

10         THE COURT:  All right.  Well, if it's all the same

11    to you all, I would like to hear argument first on summary

12    judgment and then on the conditional certification and notice

13    question, perhaps even on a different day.  I don't know if

14    that's efficient or not efficient, but let's see where this

15    goes at least for the next 30 minutes or so.  Is that okay

16    with you all?

17         Now, I understand the -- I'm not sure that there

18    needs to be a lot of oral argument on the conditional

19    certification because that's a pretty straightforward issue.

20         I don't know, you're looking at me like you have no

21    idea about what I'm talking about.

22         MR. DELGAIZO:  No, I agree, Your Honor.

23         THE COURT:  Okay.  Okay.  Do you all agree or am

24    I --

25         MS. GOST:  Your Honor, I believe we would agree, as

1  well.

2          THE COURT:  Well, I may ask some questions.  I may

3  go back on what I'm saying, but let's first talk about the

4  summary judgment motion, shall we?  And what I would like to

5  do on that point is rather than ask you to recite for me what

6  you've got in your briefs, which I have no need to hear, I'd

7  like to ask some questions of counsel -- although why don't we

8  do this.  Defense counsel, are you both planning to argue or

9  just one of you?

10          MS. GOST:  Just myself.

11          THE COURT:  Okay, so you flipped the coin and you've

12  gotten the bad side of the --

13          MS. GOST:  However you might want to look at it.

14          THE COURT:  Why don't you maybe take a few minutes,

15  set the stage, and then I'll interrupt you.

16          MS. GOST:  Okay.  Well, as Your Honor knows from

17  reading the Complaint and the briefs, plaintiffs have brought

18  a claim claiming that they should be compensated for all the

19  time that they're on-call.  It appears, based on the briefing,

20  that they've conceded that the time they sleep is separate

21  from that.  That wasn't really the position that they took

22  during the course of the case, but they have carved out, I

23  believe, and they've excluded the time that they're sleeping

24  because the field service technicians are on-call,

25  essentially, 24/7.  I mean, they work a workweek and hours

1   where it's not actually during their core hours or performing

2   their normal work during the week, they are on-call, and what

3   the plaintiff here has claimed is that all of that on-call

4   time should be compensated.  They agree that the time that

5   they actually have to respond or are called out, go to a

6   customer site or respond to a call, that they're paid for that

7   time and they are paid for it.

8           THE COURT:  There's no dispute about that.

9           MS. GOST:  There's no dispute about that.  So the

10  dispute is about time that -- I'll use the term idle.  I think

11  the Court has used that term in some of the case law.

12          THE COURT:  Well, "idle" is a little bit of a

13  pejorative unless you're saying idling the way the car idles

14  when the engine is on, but it's not moving in traffic.

15          MS. GOST:  I think -- the descriptive that I'm

16  really going for is the time when they're not answering a

17  phone call --

18          THE COURT:  Okay.

19          MS. GOST:  -- during their on-call time period or

20  where they're not actually leaving and going to a

21  customer's site.  So it's all the other time.

22          And the Third Circuit has laid out a four-factor

23  test.  I won't recite it for Your Honor because I know you've

24  read that, but I do want to focus on what I think is the

25  critical component to that and that is that Air Liquide's

1   policies are so onerous such that these individuals cannot

2   utilize the time that they're not otherwise performing work --

3   that we would all agree is work -- they can't use that time

4   for their personal pursuits.

5          And the record here is clear that not only are the

6   policies not onerous, they're basically nonexistent.  The

7   policy is that the individuals have to have their phone with

8   them and they have to be available to answer that phone when

9   they can.  Although there's been plenty of testimony that

10  shows there's times when they can't, they can't, and there's

11  no repercussion for that.  But the expectation is they have

12  the phone and they can answer that phone and that's the only

13  policy that there is.  And other than that, they're free to

14  engage --

15         THE COURT:  Well, was there a policy or an

16  expectation or stated rule that if somebody was "on-call,"

17  that they would be expected to reach a customer's facility

18  within a certain amount of time?

19         MS. GOST:  No.

20         THE COURT:  Or if a call-out was necessary?

21         MS. GOST:  No.  No.  There is no response time

22  policy.  And in terms of being able to utilize that time, I

23  think the record's replete with evidence that not only could

24  they use the time -- and Mr. Brackin and Mr. Ciccarelli I'm

25  talking about in particular -- not only could they use it

1    under Air Liquide's policy, but they did, in fact, utilize

2    that time for their own personal pursuits.  And Mr. Brackin

3    started a business and that business thrived during the time

4    that he was on-call for Air Liquide.  Mr. Ciccarelli testified

5    about being able to go out to dinner, go to Cape Cod on the

6    weekends, utilize that time for his own pursuits, you know,

7    with the caveat if the phone rang, he would answer the phone

8    if he could, and at times minimal, meaning in terms of the

9    frequency, of having actually to be called out.

10              THE COURT:  So the record, though, from what you're

11    saying does not demonstrate that either these two plaintiffs,

12    as a general policy matter, the employees or the FSTs,

13    understood that they had to be physically at home when they

14    were on-call?

15              MS. GOST:  Not only does the policy not say that,

16    they understood that it didn't say that and they did not

17    remain at home during that time period that we're talking

18    about and they engaged in things that, you know, most people

19    do, go out to dinner, go to the movies, you know, leave for

20    the weekend.  They were able to do that.  And in terms of

21    frequency of actually being called out, meaning they had to

22    actually get in their truck and go to a customer's site, you

23    know, even if I credit -- and for purposes of summary

24    judgment, that's what we're doing here -- credit their

25    testimony in terms of the amount of time that happened, it's

1   still very infrequent.

2          THE COURT:  How frequently did they trade on-call

3   shifts?  Do the records indicate?

4          MS. GOST:  That varied between the two of them.  I

5   mean, both of them testified that they knew they could.  They

6   did not do that that often.  I mean, they did not -- neither

7   one of them actually traded shifts with a coworker on a

8   regular basis.

9          THE COURT:  Well, I read there was some sort of

10  company or policy impediment to doing it, or was it just a

11  personal preference?

12         MS. GOST:  It was a personal preference.  They just

13  didn't do it.  They knew they could do it and, you know, they

14  certainly testified to being -- to understanding that, hey, if

15  they wanted to go to a wedding, you know, some events that

16  might take them out of the area, that they could ask one of

17  their colleagues to cover, you know, their on-call time, and

18  so on that type of basis, they didn't do it.  On vacation,

19  they absolutely did.  You know, if they were taking vacation

20  for a week, there would be another FST that was designated to

21  cover and, vice versa, they would cover for a colleague if

22  that colleague was on vacation.

23         THE COURT:  Okay.  Now, if I were to find they

24  should be compensated, would that mean necessarily that then

25  every day each FST would be compensable 14 hours a day?

1           MS. GOST:  Well, the policy in terms of working in a

2     day was 14 hours and so, you know, it appears that in terms of

3     the opposition to the summary judgment, that would be correct

4     for a weekday.

5           THE COURT:  It's either 0 or 14.

6           MS. GOST:  It's either -- right.  So it's

7     either -- right, it's either some delta between what they

8     actually got paid for the day and 14, and then the weekend

9     days, right.

10          But, you know, what's not disputed is that the time

11    that they entered in the time system, they were paid for, and

12    they were paid at the appropriate rate.  So they have not

13    taken a position that any of that is in error or that there

14    was some underpayment as a result of a --

15          THE COURT:  No, I understand.  I'm just trying to

16    get a sense of, you know, is it 0 or -- is it either 0 or 14,

17    but nothing in between?

18          MS. GOST:  Well --

19          THE COURT:  Unless it happened to be a day they were

20    working and otherwise an elongated day.

21          MS. GOST:  Yes, the testimony would have been that

22    it was 168 hours, which I believe is 24 times that, minus what

23    they actually got paid.  I mean, that was certainly the

24    testimony.  It does appear to have been refined in the

25    argument to be not when I'm sleeping to accept the 14-hour as

1   the limit on that.

2            THE COURT:  All right.  How about this.  How about

3   if I hear from your opposing counsel and then if there's

4   anything you want to say in rejoinder, you can do that.

5            MS. GOST:  Thank you, Your Honor.

6            THE COURT:  So on the issue of the summary judgment,

7   what do you think the real dispute of facts are?

8            MR. DELGAIZO:  The disputes of facts, Your Honor?

9            THE COURT:  Right.

10           MR. DELGAIZO:  The disputes of fact are -- well, I'd

11  like to start with the area that I think that the plaintiff is

12  focused on as being the remaining dispute.

13           THE COURT:  Okay.

14           MR. DELGAIZO:  Because, Your Honor, if I can take a

15  step back, I mean, the disputes of facts are frequency of the

16  calls, whether they can pursue personal endeavors, and whether

17  the other factors to determine whether they should be paid for

18  on-call time favor the plaintiffs.

19           THE COURT:  Well, why are they in dispute?  What are

20  the facts that are in dispute?  Those are conclusions that

21  you're saying are disputed.

22           MR. DELGAIZO:  Let's start with some of the things

23  that defense counsel said.  First whether there would be any

24  type of discipline if they failed to answer a call.  And the

25  testimony shows that if they failed to respond to a call while

1    on-call, they could be charged with insubordination and

2    insubordination is a company violation that can result in

3    termination.

4            There was also testimony from Joseph Brackin that

5    the company would retaliate against you if you didn't take

6    these on-calls.  These field service technicians, as you're

7    probably aware, are geographically spread out all over the

8    Northeast.  They have set customers.  They are the designated

9    persons to cover those customers.  And so when they're not

10   available, there's no one else.  Well, they eventually have to

11   find someone else, as they said, or they'll call in the

12   helicopter, I think is what I think Mr. Craig said, with

13   respect to getting someone to the clients, but they have to

14   take their on-call and that's the testimony from this dispute.

15   That is definitely in dispute.

16            But there are other issues, Your Honor.

17            THE COURT:  But they were permitted to trade; right?

18            MR. DELGAIZO:  That's --

19            THE COURT:  They are permitted to trade on-call

20   shifts?

21            MR. DELGAIZO:  They're permitted to trade just like

22   there's no policy about what they're expected to do while

23   they're on-call.  And the testimony actually from the FST says

24   this trading of on-call in practice was very difficult

25   because, first of -- well, the testimony I'll tell you is

1    this.  Ciccarelli said that he switched on-call maybe once or

2    twice over his many years of employment.  Nobody liked it.  It

3    was a huge inconvenience.  Plaintiff Brackin never asked

4    another FST to switch on-call and the reason why is because

5    they'd be putting all of their on-call --

6            THE COURT:  The reason why as stated in the record,

7    not what's argued --

8            MR. DELGAIZO:  In the record.

9            THE COURT:  All right, for summary judgment, you

10   have to be able to recite chapter and verse as to where in the

11   record this is.

12           MR. DELGAIZO:  I will, Your Honor.  This is

13   Ciccarelli who testified, "Nobody liked it," on page 129 of

14   his deposition.  That's Exhibit C in the plaintiff's response

15   to summary judgment.  The huge inconvenience is on that same

16   page, page 129.

17           Brackin said that he never switched on-call,

18   page 284 and 285.

19           There's further claim that they could use vacation

20   time or personal time, but they also had to ensure that when

21   they took that vacation time or personal time, the other FSTs

22   in proximity were not on vacation and personal time because

23   they couldn't switch their on-call.

24           So that was what they were left to with respect to

25   switching out from underneath their on-call and we submit that

1   there is a genuine issue there of whether that was sufficient

2   to make the on-call less restrictive or more restrictive.

3   There's a factual issue there.

4          But, Your Honor, as we pointed out with the

5   frequency of the calls, there's a dispute over how to evaluate

6   whether this was a call-out or not.  The record that the

7   employers produced uses this on-call time which is

8   specifically defined and, that is, when you're at home and the

9   car's been turned off.

10          Actually, I have some handouts here.  I'm not sure

11   if these found their way into the motion, but if Your Honor

12   will accept these documents.

13          THE COURT:  Well, I will only accept something

14   that's actually in the record.

15          MR. DELGAIZO:  It is stated in the record.

16          THE COURT:  First show your opposing counsel and

17   then make sure that there's a record recitation or citation on

18   the document.

19          MS. GOST:  I saw these on the record, but if they're

20   not, I don't have any objection, Your Honor, to the policies.

21          MR. DELGAIZO:  So these are Air Liquide's policies,

22   the ones that were in effect, and they referred to on-call

23   response payments and call-out pay.  And a call-out pay is

24   when a nonexempt employee's off duty, away from his or her

25   assigned work location, is called to commute back to work at

1    their assigned work location or the customer's location

2    outside of his or her scheduled shift at Air Liquide, and then

3    they will receive the four hours regardless of how long it

4    takes them to get to this destination.  When you read that,

5    which is on Bates stamped Brackin 876, which I'll be handing

6    up, Your Honor, with the on-call response pay which states to

7    be eligible for on-call response payment, the employee must

8    have worked a minimum of 40 hours in the workweek.  If the

9    employees work less than 40 hours, on-call response time will

10   be based on base pay rate.

11        So these inputs about on-call time are under these

12   defined situations.  And I've gone through Plaintiff

13   Brackin's work orders over the time in this case and

14   identified 30 incidents where he is following up on a work

15   order outside of an eight-hour workday.  So -- and their

16   testimony, you know --

17        THE COURT:  So if he did that, then he would get

18   paid for that; right?  You actually followed up.  That's

19   not -- nobody's squabbling about that.

20        MR. DELGAIZO:  No, he got paid for the time that he

21   worked.  The question is the frequency of these calls.  And so

22   he's getting called -- these FSTs are getting called outside

23   their core hours of eight hours of pay, the frequency of the

24   calls that they are receiving, and this is how the plaintiff

25   submits that these numbers should be evaluated.

1          But still getting into the issue of whether there's

2     sufficient frequency of calls is what narrows this focus of

3     this case that plaintiff has admitted to down to the issue of

4     those Fridays.  We're not conceding that we don't have a

5     claim, but on the Fridays when I think that there's mention in

6     the motion they put in 40 hours, they're required to be at

7     home the following day.

8          THE COURT:  Well, wait a second.  You mean like on

9     Saturday?

10          MR. DELGAIZO:  On Friday.  So when a FST has worked

11     40 hours prior to a Friday, they're expected to be at home.

12          THE COURT:  How do we know that's what they're

13     expected to do?

14          MR. DELGAIZO:  That's in Exhibit -- I want to say

15     Exhibit G to plaintiff's response.  It's an e-mail and it's

16     from John McBride, who's the Director of Field Service, and it

17     states in there, "When you have 40 hours in, you are expected

18     to be at home."

19          And the testimony from Plaintiff Brackin and from

20     Ken Marple, who's a current employee of Air Liquide, say that

21     when you put in 40 hours, you're expected to be at home.  Ken

22     Marple was testifying to a text message he received.

23          This is all in the plaintiffs' brief and I can cite

24     to the record, but that's kind of where this case has been

25     whittled down to.

1          If I may take a step back, you have a large area of

2    time there for these field service technicians.  They're

3    working 24 hours a day seven days a week.  They're on-call.

4    They're on-call all the time.  Brackin worked there for 30

5    years.  Ciccarelli worked there for about a half dozen years,

6    four or five years.  These people lived.  They found things to

7    do.  They could go grocery shopping, they could mow their

8    lawn.  So because of these facts and the standards, this case

9    has more or less been whittled down to that Friday.  To that

10   Friday.

11         THE COURT:  Okay, then let's stick with that for a

12   moment because now I'm getting two diametrically opposed

13   pieces of information from counsel.

14         Plaintiffs' counsel has just said there's an e-mail

15   in the record that says the FST was expected to be home on

16   Friday where they had previously logged 40 hours in that week.

17   And then my question is, well, okay does the evidence support

18   this?  Counsel says, Yes, Exhibit G is the McBride e-mail.

19         Let me just follow this trail because it seems to me

20   it's fairly fundamental to the summary judgment motion.

21         Is there such a document in the record?  And I mean

22   plaintiffs' counsel is going to say yes.

23         What's the defense counsel's response?

24         MS. GOST:  The defense counsel's response is that

25   there is an e-mail from a Rick Williams.  I think that's the

1   e-mail that he's referring to.  It's outside of the time

2   period of this case.  It's in November 2011.  It indicates

3   that when you have 40 hours in before Friday, that you are

4   expected to be at home.  It does say that.

5           THE COURT:  Okay, so that's outside the time period.

6           MS. GOST:  Yes.

7           THE COURT:  Before or after?

8           MS. GOST:  Before.

9           THE COURT:  So it's three days, the time period at

10  issue in this case.

11          MS. GOST:  Three days time period at issue in this

12  case.

13          THE COURT:  Okay, and then why do we know that does

14  not continue to be the company position?

15          MS. GOST:  Because both plaintiffs testified that

16  they did not have to stay at home on that Friday and that

17  they, in fact, did not stay at home.

18          THE COURT:  So if they've testified they figured

19  they could wiggle away from the company policy or thumb their

20  noses at it, you're saying that defeats summary judgment?

21          MS. GOST:  It wasn't a company policy.  I mean, the

22  testimony about this e-mail came from Brian Craig, the

23  corporate designee, as well as the plaintiffs.  It was a time

24  period in November when the company was trying to control

25  overtime.  And if you read the whole context of the e-mail,

1   what it says is, "When you have 40 hours in, you are expected

2   to be at home.  Since we are a service organization, you will,

3   however, be expected to keep your phone with you to be able to

4   respond should an emergency arise."

5           Both plaintiffs indicated that they did not have to

6   stay at home at that time period, but remember this is still

7   during the core week.  We're talking about Friday.  So this is

8   not really talking about their on-call time.  It's talking

9   about on Fridays when maybe they've hit 40, the company's

10  trying to manage overtime, have them not do their preventive

11  maintenance work, but still be available by phone.  The e-mail

12  does say "at home."

13          Both plaintiffs testified that they didn't have to

14  stay at home.  They understood that and, in fact, did not stay

15  at home during those Fridays.  But those Fridays --

16          THE COURT:  How does that play out?  I mean, it

17  seems like it's pretty straightforward.  If the e-mail says,

18  "You've got to be home on Fridays" and the plaintiffs are

19  saying, "Yeah, we didn't take that so seriously," what does

20  the case law say as to whether or not if the plaintiffs

21  themselves -- it may make them a difficult class rep if there

22  were a class question, but what am I supposed to do with that

23  piece of information?

24          MS. GOST:  I mean, from our perspective, there was

25  no testimony that this was the policy.  I mean, there was

1    testimony that this was an e-mail that predated --

2                THE COURT:  An e-mail from a supervisor?

3                MS. GOST:  From a supervisor of some of the folks.

4    Not all of them at that particular point in time.

5                THE COURT:  Okay.  Well, I'm not sure I now yet know

6    whether there is or isn't evidence to support or create a

7    factual dispute on the question of Friday, the Friday

8    expectations.  I mean, it could be that it turns on the

9    question of what does it mean you're obligated to be "at home"

10   if you've worked 40 hours as of Friday.

11               MS. GOST:  I think what I would say to that, Your

12   Honor, is that does not address on-call time.  It addresses a

13   different kind of time.  It does not address this e-mail and

14   there's no policy that says when you're on-call, you're

15   expected to be at home.  And this e-mail doesn't say that

16   either.

17               What this e-mail says is that when you hit 40 hours,

18   and if you hit 40 hours, the testimony, if you hit, say, 40

19   hours by Thursday, then in conjunction with your manager, you

20   would discuss whether you would go on your regular calls

21   Friday or not, or whether you would not do that.

22               But this e-mail does not address on-call.  It

23   doesn't cover when somebody's on-call.  It covers a much more

24   discrete time period and that is -- I understand, you know,

25   counsel's argument that he thinks this case has now gotten to

1    that Friday time period.  You know, my position is that's not

2    on-call time.

3           THE COURT:  Okay.  I interrupted plaintiffs'

4    counsel.

5           MR. DELGAIZO:  Thank you, your Honor.

6           Just to address some of the issues, this e-mail did

7    come from a supervisor.  Rick Williams, my understanding, is a

8    zone manager.  He's above the actual direct supervisors.  The

9    field service technicians are about 12 to 14 in the Northeast

10   region, have about two supervisors, Stacey Zook and then Brian

11   Craig for some time, and their supervisor is this Rick

12   Williams and his supervisor is John McBride who's the field

13   supervisor.  And it's our understanding -- plaintiffs'

14   understanding that he's the field supervisor over the lower 48

15   states because during the testimony about a specific area of

16   the Northwest, Mr. McBride was the field supervisor over that

17   region as well.  So this e-mail, which is in the record and

18   states they have to be at home, was from a supervisor.

19          Now, Ken Marple, who's an employee of Air Liquide,

20   he was called to testify in this matter, testified on page 29,

21   and this is also in the plaintiffs' response.  He says, "In

22   other words, I reached 40 hours.  We were told March 15th this

23   year that overtime must be approved and it's been since then I

24   had reached 40 hours by Thursday, so I sent a text to Brian

25   asking if I should work Friday or stay home since I reached

1    the 40-hour limit and I believe his response was, 'Stay home,

2    be available.'"

3           So there's a current employee saying --

4           THE COURT:  That could mean stay home meaning don't

5    come to the company premises.  Stay home may be a broader

6    concept than stay at your home at 123 Maple Street.

7           MR. DELGAIZO:  I think -- and that's a factual

8    dispute, Your Honor.  That's their argument.

9           The testimony from the plaintiffs and also Mr.

10   Marple is that you had to be at home.  And we know that the

11   home is the office of these field service technicians.

12          You know, if I can take a step back again, Air

13   Liquide keeps this on-call policy very vague.  Their only

14   requirements are be available.  But be available, as you know,

15   and as put forth in the plaintiffs' response means be ready to

16   respond to a potential emergency call from customers all over

17   several states; calls that they would have to go to hospitals,

18   they would respond to disasters on client's property.  You

19   know, they left it to these individuals almost like

20   independent contractors, but behind this was "do a good job

21   and stick to it."  And so, you know, it's our position that

22   Air Liquide purposely leaves these things vague, they don't

23   have these policies, and these little nuggets like this e-mail

24   is really what underlies the policy and shows what was

25   happening behind the scenes.  And also the testimony of Mr.

1    Brackin, Mr. Ciccarelli, and Mr. Marple so far has shown that

2    there were restrictions on these individuals while on-call,

3    especially on the Fridays where they were required to stay at

4    home.  And the case law supports that when you're required to

5    stay at a location at the employer's behest or request, that's

6    a strong evidence of being a compensable time on-call.

7              MS. GOST:  Your Honor, I'd like to make one more

8    point about the e-mail that I neglected to make, an important

9    point, that the e-mail clearly says that the company has set

10   new cost-saving measures for all of us through the end of the

11   year.  So there's nothing in the e-mail directive dated

12   November 15th, 2011, that indicates that this directive would

13   extend beyond December 31st, 2011.

14             THE COURT:  This is Exhibit G; right?

15             MR. DELGAIZO:  I believe so, Your Honor.  Let me

16   confirm.

17             THE COURT:  And where is the --

18             MR. DELGAIZO:  It's F.

19             THE COURT:  F.

20             MR. DELGAIZO:  Yes.  I'm sorry, Your Honor, it's

21   Exhibit F.

22             THE COURT:  Where is the exhibit that talks about

23   the cost savings to the end of the year?

24             MS. GOST:  That's the same e-mail.

25             THE COURT:  Oh, okay.

1          MS. GOST:  That's the same e-mail, yes.  It starts

2    by talking about the cost saving measures and then details a

3    couple of those cost saving measures, one being the stopping

4    work at the 40 hours from an overtime payment standpoint.

5          MR. DELGAIZO:  Your Honor, in response, the

6    testimony from Mr. Marple was that as of March of this year

7    2016, that same policy, Stay at home, be available, was in

8    effect.  So we submit the evidence supports that was the

9    policy throughout the relevant time.

10          MS. GOST:  Your Honor, if I may respond, I mean, I

11    disagree.  We've cited it in our reply brief, so I won't

12    recite all to you, but Mr. Marple's testimony was actually

13    that he understood that he didn't need to stay at home.

14    Rather, he just had to be available.

15          THE COURT:  Who was that?

16          MS. GOST:  Mr. Marple, the same individual that my

17    opposing counsel just cited.  His testimony at 71 -- page 71,

18    was that he just needed to be available, not stay at home.

19    And both points are subject to the summary judgment motion.

20    Mr. Ciccarelli and Mr. Brackin all testified that they

21    understood that they did not need to stay at home while they

22    were on-call and that they had never received any directive

23    that told them they needed to stay home while they were

24    on-call.  And those citations and their specific testimony are

25    on page 2 of our reply brief.

1          And, Your Honor, I have a few responses to make to

2    Mr. DelGaizo's other points, but I'll await and see if Your

3    Honor wants me to do that or not at this time.

4          THE COURT:  Well, no, go ahead, but I am curious to

5    know why do you think that the Friday time after the 40 hours

6    was not on-call?

7          MS. GOST:  Well, it was on-call.  I mean, what I'm

8    saying is it converted to be on-call, but that was the

9    construct of that time --

10         THE COURT:  Well, a better way to ask it, what do

11   you characterize the Friday time as?

12         MS. GOST:  I characterize it as not needing to do

13   their normal preventive maintenance work and handle any other

14   calls, and that during that time, they would, if an emergency

15   arose and they received a call during that time, need to

16   respond as they might on any other time, you know, when

17   they're not doing work.  But their core hours were 8 to 5.

18   And so what that time was was relinquishing them from having

19   to do any of the preventive maintenance work during that time

20   period.  So, I mean, they would have to have their phones and

21   so in that way certainly it would be similar to the on-call

22   time.

23         THE COURT:  Let's say an FST technician is required

24   to come to the company premises, but they can sit and they can

25   read magazines, they can read, you know, Popular Mechanics --

1              MS. GOST:  Right.

2              THE COURT:  -- for as long as they want at their

3    desk or in the lunch room or in their car in the parking lot

4    or, you know, on the patio or wherever they want.  What was

5    that?  Would that be compensable time?

6              MS. GOST:  If all they could do was read magazines.

7              THE COURT:  Well, play chess or whatever.  They

8    could work out in the yard.  They could run laps around the

9    company premises.  They could do whatever they wanted.  They

10   could sleep.

11             MS. GOST:  I think -- I mean, it would depend.  I

12   think it would depend.  I mean, certainly there would be more

13   restrictions than certainly is evident in this case.  They'd

14   still be able to engage in personal pursuits if they got to

15   choose what they wanted to do.  Depending upon how limited

16   they were in those choices, I think that maybe could go either

17   way.  In that scenario, I think there might be an argument --

18   yes.  Sure.  Yes, there might be in that case.

19             And I just want to make one other point on the sort

20   of Friday on-call issue and the point I was trying to make,

21   and to the extent I misspoke or confused anybody, is that the

22   directive we were talking about is dealing with not having to

23   work during the sort of what otherwise would be the core

24   hours.  I accept that once they logged off on Thursday, if

25   they didn't log back on, they would technically be on-call.

1   But this e-mail directive that we were talking about when we

2   were talking about the Fridays does not address on-call time

3   at all.  It's only addressing that Friday time period.  It if

4   only addressed that Friday time period for another month and a

5   half --

6           THE COURT:  Well, let me just cut to the chase.

7   What is the actual record evidence as to what "on-call" means?

8           MS. GOST:  The record evidence, and I believe it

9   came from the plaintiffs, as well, but I certainly know that

10  Brian Craig, the corporate designee, talked about that, and

11  the on-call time begins once the FST is logged off for the

12  day.  So their core hours were 8 to 5, but they could log off

13  for the day at 6 or 7 if they had a long day and, you know,

14  was otherwise extended beyond -- you know, it didn't start at

15  5 o'clock.  It would start when they would essentially get

16  home, kind of sign out of their last work order, and then they

17  would be on-call until they signed into their next work order

18  the next morning, or if it was a Friday, Monday morning, and

19  then they would be working in their core hours and they

20  typically did preventive maintenance or emergency servicing.

21  You know, the testimony certainly is they might receive a

22  call, say, over the weekend and say, "Okay, that's not an

23  emergency, I'll come out Monday afternoon."  You know,

24  rearrange their schedule to get out there Monday afternoon to

25  attend to whatever needed to be attended to.  So the on-call

1    time would start and stop depending upon sort of that first

2    time during the core time period that they would log in and

3    out of the computer.

4            THE COURT:  Anything more on this issue?

5            MR. DELGAIZO:  Yes, briefly, Your Honor.

6            I just wanted to address your hypothetical.  It

7    sounded like the Armour & Company versus Wantock case and so I

8    would say that that would be compensable time.  And the

9    on-call time being on a Friday, if they log out after 40

10   hours -- 40 hours were their core work hours in a week.  If

11   they log out on a Thursday and they're done with 40 hours,

12   they're on-call on a Friday.  So we can make that Friday work

13   when they're supposed to be at home, be available, as on-call

14   time.  And that's all that the plaintiff has remaining other

15   than handing up these documents.  (Indicating)

16           MS. GOST:  And, Your Honor, in terms of the

17   documents, those policies were attached, I believe, on the

18   conditional certification motion, so they are in the record

19   for the case.  I don't know that they were ever attached to --

20           THE COURT:  Well, fine, you can hand those to the

21   law clerk, if you will.

22           I do want to spend a couple of moments on a couple

23   of questions on the conditional certification question if you

24   wouldn't mind and, that is, what's the precedent, if any, on

25   the point of whether or not a plaintiff has to establish some

1    sort of illegal policy before conditional certification is

2    available?

3              Do either of you have anything on that point?

4              MS. GOST:  Your Honor, I mean -- do you want to

5    respond to that -- or you can go first.

6              MR. DELGAIZO:  Well, Your Honor, what is it, the

7    burden or the standard?

8              THE COURT:  Any precedent.

9              MR. DELGAIZO:  Any precedent.

10             THE COURT:  Yes.

11             MR. DELGAIZO:  Well, Your Honor, it's my

12   understanding that we're at the first stage of certification,

13   which is the modest -- let me see, the Third Circuit calls it

14   a modest factual showing and, Your Honor, our position is that

15   the policy is not paying on-call time.  And it's also the

16   policy in the e-mail.  I don't have any case law here to say

17   that that e-mail is a policy or a verbal policy qualifies, but

18   it's our position that these individuals are similarly

19   situated at this time to at least get a putative class.

20             THE COURT:  Well, let me ask you this.  Let me go

21   maybe to a different question.  What can I look to in this

22   case to give me any comfort that anybody else other than Mr.

23   Brackin and the one plaintiff who has opted in thus far are at

24   all similarly situated?  What evidence is there that other

25   technicians in the Northeast or around the country, for that

1   matter, are similarly situated with respect to the ability to

2   pursue personal activities, for example, when they're on-call?

3           MR. DELGAIZO:  It's because all these same policies

4   apply to all the field service technicians in the Northeast.

5   We know that they've had the same supervisors, that these

6   supervisors collaborated when disciplining these employees.

7           THE COURT:  Well, is there evidence of that or how

8   do you know this?

9           MR. DELGAIZO:  There was testimony from Brian Craig.

10  Page 12, I asked him, "Have you ever terminated a field

11  service technician?"  He said, "No, I have not terminated my

12  own field service technicians that report to me.  I've

13  assisted in the termination of another field service

14  technician that did not report to me."

15          I said, "Is that while you were in Pennsylvania?"

16  He said, "Yes."

17          "Did that field service technician report to Stacey

18  Zook?"  He said, "Yes."

19          And then on page 13, he said, "Stacey and I talk a

20  lot about our technicians and how we implement disciplinary

21  action and that sort of thing so that we're consistent, but I

22  was probably talked to and told what was going to happen and

23  that's how that ended up that he was terminated on his own

24  merit."

25          THE COURT:  But how do you know that it relates to

1    the matters and issues in this case?

2            MR. DELGAIZO:  With regard to the policies of not

3    being paid on-call and the same policies, Your Honor?  I

4    believe the testimony also of Mr. Brackin, although I can't

5    cite it, is all these field service technicians operated under

6    the same policies and programs.  They just had different

7    clients and were located out of different residences all along

8    the Northeast coast.  There's 12 to 14 of them and they're all

9    in the Northeast region and they all do the same thing,

10   service clients, Air Liquide equipment.

11           Now I'll address some of the issues that you might

12   hear.

13           THE COURT:  Okay.

14           MR. DELGAIZO:  That they're ranked as FST 1 through

15   FST 4, but the testimony on that is more or less that these

16   don't mean that a 4 is greater than a 1.  It's just that

17   they're trained on different types of mechanisms, different

18   types of equipment, but this on-call time isn't changed by

19   whether they are trained on FST 1 equipment or FST 4

20   equipment.  They all have to be available.  They all have to

21   respond immediately.  They all have to put on their uniforms

22   and get in their vehicles and drive to the customer's sites

23   and they're all required to answer all their on-calls.

24           So, you know, our position is --

25           THE COURT:  But are they all obligated to do so

1    within a certain time period?

2         MR. DELGAIZO:  There's no requirement from Air

3    Liquide that you have to respond within a half an hour to

4    20 minutes.  Again, they leave these matters up to the field

5    service technicians, but the testimony's unequivocal that

6    immediate response is always a possibility.

7         So it's our position for the first stage of

8    certification, the Northeast region is definitely similarly

9    situated, these 12 to 14 field service technicians.  And to go

10   nationwide, the only region we know that was treated

11   differently with respect to on-call was this Pacific Northwest

12   region where they have a different type of on-call mechanism

13   where they switch it amongst the field service technicians

14   because their clientele's all located in one area.  So the

15   field service technicians are not spread out where they have

16   to cover several states.  They're all in proximity to the same

17   clientele so they can switch on-call.  But aside from that, we

18   know that there's, I think, 5 to 6 Brackin testified, 5 to 6

19   regions.  He estimated 75 to 100 field service technicians and

20   that is his testimony --

21        THE COURT:  Well, why -- I take it Mr. Brackin would

22   assume or would guess that there was going to be more than one

23   opt-in plaintiff.  But why?  Why have that assumption?

24        MR. DELGAIZO:  Why would there be more than one?

25        THE COURT:  Yes.

1          MR. DELGAIZO:  Because they were all under the same

2    circumstances treated the same.

3          Now, Tom Ciccarelli, who's from Boston, he covered

4    the whole North -- New England region.  His testimony and Mr.

5    Brackin's are very similar to the treatment that they

6    received, the supervision, the requirements, and the absence

7    of rules.  They were all basically operating in the same

8    manner.  It's as if there were, you know -- I don't want to

9    use hypotheticals -- a clerk.  There are 12 clerks and they're

10   just spread out all along the Northeast, but they're all doing

11   the same thing.  They might be doing different assignments,

12   but their job responsibilities are substantially the same, and

13   that was page 257 for Mr. Brackin's testimony.

14         Thank you, Your Honor.

15         THE COURT:  Okay, counsel, anything more on the

16   certification question?

17         MS. GOST:  Sure.  In response to Your Honor's

18   question in terms of the illegal policy, there does need to be

19   established an illegal policy.  There certainly needs to be

20   established in order to prosecute this case on a collective

21   action basis -- because that's really ultimately what is

22   needed to be decided to determine whether or not you're going

23   to ask other people if they want to join is whether this case

24   could actually be prosecuted as a collective action.  And

25   whether they're all FSTs and all had to be on-call is not the

1    ultimate issue.  I mean, that's true for the minute, they

2    might all be FSTs and they might all have been on-call for Air

3    Liquide, but the question to be decided as to whether or not

4    these folks would prevail on these claims is laid out by the

5    Third Circuit interim case, and focusing on the fourth prong

6    in particular, what the Court has said was you need to look at

7    the time to determine whether or not it's compensable as to

8    whether or not the employee could actually engage in personal

9    pursuits.  Not just whether they could engage, but whether

10   they actually engaged.  And in order to determine whether

11   somebody actually engaged in personal pursuits, you would need

12   to find out from them, you know, as I believe, you know,

13   plaintiffs concede, there are no established written policies.

14   I mean, the policy that is out there is that you have to have

15   your phone with you and be able to respond.  The policies that

16   were handed up to Your Honor and are attached to the

17   additional certification talk about how you're going to get

18   paid for taking a phone call or actually going out to a client

19   while you're in on-call status so to speak.  But there aren't

20   any policies that talk about anything other than that.  And so

21   how individuals used that time when they weren't answering the

22   phone, or, you know, going out to a customer or a client

23   location is going to be dependent on that individual.  And we

24   saw varying testimony amongst all of the four field service

25   technicians that were deposed in terms of what they did with

1    that time and how they felt about their freedom to pursue

2    personal pursuits within that time period.  And every FST that

3    would want to prosecute a claim like the claim that Mr.

4    Brackin has brought will need to do the same thing.  And

5    having to do that is then fatal to this possibility of

6    prosecuting this case on the collective basis.  You know, in a

7    hypothetical situation if we looked at Mr. Brackin and whether

8    or not he actually engaged in personal pursuits, we know he

9    did.  He did.  He went -- you know, he went out to dinner.  He

10   mowed his lawn.  He did various things like that.  But, most

11   significantly, he started a business, and by 2013, he had

12   about $300,000 in revenue.  You know, what if somebody else

13   didn't do that?  I mean, so who -- where would the common

14   evidence -- I mean, who would be prosecuting this case on

15   behalf of a group of people when the requirement is that

16   there's evidence of actually having done something.

17              THE COURT:  Well, what would you all say is the law

18   in the Third Circuit after the -- how do you pronounce it,

19   Symczyk case?

20              MS. GOST:  Symczyk case.

21              THE COURT:  Yes, the Genesis Health Care.  It went

22   up to the Supreme Court and it was reversible --

23              MS. GOST:  In terms of --

24              THE COURT:  In terms of opting in, the two-tiered

25   analysis.  What do you think the law is in the Third Circuit

1   now?

2           MS. GOST:  I mean, I think the law in the Third

3   Circuit is that once there's been discovery and there's been

4   merits discovery, that it is a more exacting standard.  You

5   know, from my perspective, Your Honor, I think that, you know,

6   there's a lot of discretion.

7           THE COURT:  The first step and the first prong is,

8   as we've heard, relatively lenient.  Fairly lenient.

9           MS. GOST:  Fairly lenient, right.

10          THE COURT:  The second one is supposed to be a

11  little more strident.

12          MS. GOST:  Right.

13          THE COURT:  The question is what does the Supreme

14  Court do with that, if anything, and what am I to do with the

15  case?

16          MS. GOST:  I don't know that the Supreme Court

17  changed that --

18          THE COURT:  You guys are pushing -- the defendant

19  here is pushing for an analysis that's not quite in keeping

20  with that case.

21          MS. GOST:  I disagree.  I mean, I think that the

22  analysis that --

23          THE COURT:  Okay.

24          MS. GOST:  -- we are advocating here is take a look

25  at the record evidence.  I mean, I don't think, in my view,

1    that the Supreme Court changed that; that, you know, you go

2    through discovery and you don't get to zero that out and start

3    from the beginning, and just maybe if the plaintiff had filed

4    his case -- their motion earlier on when they could have, you

5    know, the Supreme Court --

6              THE COURT:  Let me put it this way.  I thought that

7    what you were doing is urging the Court to go immediately to

8    the second prong or the more stringent standard rather than

9    going through at the preliminary stage the less strident

10   approach, which arguably is all that's required now.

11             MS. GOST:  I would disagree that's what's required

12   now that there's been full merits discovery in the case with

13   respect to two plaintiffs.  All of that evidence should be

14   considered.  That's the position that the cases have taken

15   that are looking at this issue after there's been some

16   discovery.  I mean, these cases have evolved, as I'm sure Your

17   Honor knows.  I mean, there used to be a time when the motion

18   for conditional certification would get filed very early and

19   then it became an issue that there wasn't enough evidence at

20   all to kind of assess anything, you know, in terms of the

21   similarly-situated status, and now the trend tends to be more

22   now to take discovery.  And from our perspective, looking at

23   that discovery requires a little bit more of an exacting -- an

24   exacting look as opposed to just taking a look at the

25   allegations in a Complaint with very little evidence to

1   support it.  But, I mean, the Supreme Court has indicated both

2   in -- more in Rule 23 cases certainly than in conditional

3   certification --

4            THE COURT:  Well, it's different.

5            MS. GOST:  -- to try to balance that.  So from my

6   perspective, from the defense perspective, is that while it is

7   a little bit different, the context of the analysis, at the

8   end of the day, what we're looking at is the same thing.  I

9   mean, how can this case be tried and can this case be tried on

10  a collective basis?  Because, you know, the argument down the

11  road if notice goes out and you've got a number of opt-ins

12  isn't going to be that we have 50, 100, or however many there

13  might be, 10, 12, whatever it might be in the case, all of

14  them testifying.

15           THE COURT:  Let me ask the same question I asked

16  your opposing counsel and, that is, is there any post Symczyk

17  case law that you can point to to support the idea that where

18  there has been discovery, we just skip step one and go

19  immediately to the more stringent test?  Do you have a Third

20  Circuit case on that?

21           MS. GOST:  I don't believe so.  Not that I can point

22  to quickly right now and I don't know that there even has been

23  one.

24           THE COURT:  I'm going to do what I always do and,

25  that is, particularly where I kind of cut oral argument a

1  little teeny bit short, you may want to confer with Ms.

2  Feldman here and get a copy of the transcript, but I'll give

3  you all like two weeks to supplement your submissions and then

4  I'll go ahead and decide the motion.

5          MS. GOST:  Okay.

6          THE COURT:  Okay.

7          MS. GOST:  Thank you, Your Honor.

8          THE COURT:  Do you have a burning need to say

9  anything more right now?

10         MR. DELGAIZO:  No, Your Honor.

11         THE COURT:  Fair enough.  Then we're adjourned.

12         (Proceedings concluded at 5 p.m.)

13

14              C E R T I F I C A T E

15

16      I certify that the foregoing is a correct transcript

17  from the record of the proceedings in the above-entitled

18  matter.

19

20

21                    _____

22                    Kathleen Feldman, CSR, CRR, RPR, CM
                       Official Court Reporter
23

24  Date: _____

25

# Exhibit B

**Index of Testimony about Remaining at Home While On-call**

| Citation | Testimony |
|---|---|
| Brackin Dep. at 150:13-18. | Q: Did you have to stay home all the time?  Were you able to, did they say, "I want you to stay at your house all the time 24/7?"<br>A:  I asked for that information.  I was never given an answer. |
| Brackin Dep. at 283:14-17. (Question from Mr. Brackin's attorney) | Q: Are you seeking on-call time for the times when you had to sit at home after maxing out 40 hours of work?<br>A: Yes. |
| Brackin Dep. at 294:12-14. (Question from Mr. Brackin's attorney) | Q: So you felt you had to be at home to respond?<br>A: I had to be close by. |
| Brackin Dep. at 295:4-6. (Question from Mr. Brackin's attorney) | Q: Can you put "very close" into a time or mileage?<br>A: I would say stay within an hour at home. |
| Brackin Dep. at 295:22-296:17.  (Question from Mr. Brackin's attorney) | Q: What was your understanding of Air Liquide's expectations after you maxed out a 40-hour workweek and you were told not to work the following day but to be on-call?<br>A: Stay home.  Be prepared to go on a service call.<br>Q: Were you permitted to go to a baseball game during work hours that day? By "work hours", 9:00 to 5:00.<br>A: No one said I couldn't.  But they're expecting, if the phone rang, for me to answer the phone immediately.  If I had to go respond to a customer site, then I would have to go immediately.<br>Q: So would you go out to a park or out to a sporting event or go out to dinner, stuff like that, or something to eat during those hours?<br>A: No, not during.  Not usually. Not typically.  On Friday, no. |
| Brackin Dep. at 300:16-301:16. | Q: Now, in responding to a question from your counsel about the time period of on-call time that you're seeking compensation for in this lawsuit, he asked you a question about whether you were seeking compensation for the time that you had to sit at home.  Do you remember him asking you that question?<br>A: Yes.<br>Q: And you said "yes"?<br>A: Yes.<br>Q: When did you have to sit at home?<br>A: I was told by e-mail that I was expected to stay at home on Fridays when my – if I had my 40 hours in, I |

| | |
|---|---|
| | was expected to stay at home on Fridays and be available.<br>Q: And what about other time periods, what about in the evening, on a Monday evening or a Tuesday evening, they told you you had to sit at home?<br>A: I don't think that was ever directed?<br>…<br>Q: What about on the weekends, were you told you had to sit at home?<br>A: I don't think that was ever directed. |
| Brackin Dep. at 304:7-22. | Q: And when you say that you were told to stay home on a Friday, if by Thursday you've reached your 40 hours and you're not going to work on Friday but you're still on-call, - -<br>A: Yes.<br>Q: - - who told you to stay home?<br>A: Hang close to home and be available.<br>Q: Who told you?<br>A: There's an e-mail from John McBride that says it.<br>Q:  Was that during the 2012 to 2014 time period?<br>A: I believe it was.<br>Q: And do you have that e-mail?<br>A: I believe we do. |
| Correspondence from Mr. Brackin's counsel. | "[T]he e-mail about being 'expected to be at home' was sent by Rick Williams and is attached hereto (BRACKN-00857-858)."[1] |
| Ciccarelli Dep. at 157:14-159:23. | Q: Okay. Okay. Were there ever occasions where, let's say, you have a particularly long week. You're working on a job and you work 14 hours and then ten hours and ten hours and anyway, you're at 40 hours by close of business on Thursday when you shut your machine off. If you just the following day had preventative maintenance that could be pushed off for the following week, would they still have you go out and work overtime on that Friday? Or did you –<br>A: No.<br>Q: No.<br>A: They told us always to stay home by the phone, but we weren't getting paid. So they tried to keep us at 40 hours. If that came to Thursday, then it was "Stay home Friday." If you look at this transcript here you gave me, Ciccarelli-12, you'll see a lot of missing Fridays.<br>Q: Okay. |

---

[1] Importantly, BRACKN00857-858 is the sole document that Mr. Brackin relies upon (Exhibit F) for the proposition that FSTs were required to stay at home on Fridays.  As discussed in Air Liquide's Supplemental Brief, the e-mail does not impact Air Liquide's On-call policy.

| | |
|---|---|
| | A: And that's why. So I mean, I wouldn't mind having a three-day weekend.<br>Q: Right.<br>A: But I wouldn't want to have to stay by the phone either.<br>Q: When you say "stay by the phone," you mean the mobile phone?<br>A: On call. Same thing, yes.<br>Q: Same restrictions while you're on call?<br>A: Exactly.<br>. . .<br>Q: So you didn't have to actually -- I guess what I'm saying is you didn't have to actually physically stay in your house.<br>A: No.<br>Q: It was just the same on call?<br>A: I told you, a decent radius where you didn't have to travel all the way to get your company truck and go wherever.<br>Q: Go get lunch with your wife or go pick up your kid from school?<br>A: Yes. |
| Ciccarelli Dep. at 187:13-22. (Question from Mr. Ciccarelli's attorney) | Q: Now, you were talking about your Fridays when you had worked already a 40-hour week and you were asked about playing golf, but you also said staying at home.<br>Were there any rules that you had to be within a certain distance on a Friday when you already worked 40 hours?<br>A: We were supposed to stand by the phone. That was explicitly said to us. "Take Friday off; you're already at 40 hours; stay by the phone." That's exactly what was said. |
| Marple Dep. at 26:24-27:12. | Q: Now, if you reached 40 hours before Friday, were you expected to work a full eight hour day on Friday?<br>A: Depending on the overtime restriction.<br>Q: So if there was no restriction, would you be expected to work?<br>A: Yes.<br>Q: Now if there was a restriction, what would you be expected to do?<br>A: To stay at home unless you were called.<br>Q: And how did you know that you were supposed to stay home unless you were called?<br>A: We were told verbally at times. |
| Marple Dep. at 28:13-29:24. | Q: When you said that you were told, I think you said |

| | |
|---|---|
| | that you were told to stay at home after reaching 40 hours. Do you recall who told you?<br>A: Yes. It would have been the field service manager.<br>Q: That would have been Stacey Zook or Brian Craig?<br>A: Correct.<br>Q: Have you ever seen that in writing?<br>A: I've seen it recently in a text.<br>Q: From who?<br>A: From Brian Craig.<br>. . .<br>A: Can I clarify?<br>Q: Yes.<br>A: In other words, I had reached 40 hours -- we were told March 15th, this year, that overtime must be approved. And it's been since then I had reached 40 hours by Thursday so I sent a text to Brian asking if I should work Friday or stay home since I've reached the 40 hour limit and I believe his response was stay home, be available.<br>Q: And that was in 2016?<br>A: Yes.<br>Q: Is that a new policy or is that what you understood to be the rule during the time relevant to this litigation?<br>A: I would say that's been the rule all along. |
| Marple Dep. at 30: 24-31:16. | Q: And this email is dated November 15, 2011, so it is going some time back. Do you recall receiving emails from Rick Williams?<br>A: Yes.<br>Q: Now, in the third bullet point, three, I think it's the second sentence, do you see where it says, when you have 40 hours in, you are expected to be at home?<br>A: Yes.<br>Q: Is that the same language you saw in the text message?<br>A: No. The text was not that specific.<br>Q: What did the text message say?<br>A: I initiated the text to Brian saying that I had reached the 40 hours, should I work Friday or not and his response was, be available. |
| Marple Dep. at 32:21-33:1. | Q: And did you ever see in writing or were you ever told where you should be while you were on call?<br>A: Where I should be? No, other than the be available. |
| Marple Dep. at 71:3-8. | Q. Okay. And when you indicated that Mr. Craig directed you fairly recently not to work on that Friday but to stay home, did he tell you to stay home or did he tell you to have your phone with you? |

| | A: I believe it just said be available. |
|---|---|
| Coleman Dep. at 32:15-33:9. | Q. And I'm going to direct your attention to the third bullet, second sentence, which states, when you have 40 hours and you are expected to be at home, since we are a service organization, you will, however, be expected to keep your phone with you to be able to respond should an emergency arise. |
| | A: Right. |
| | Q. Did anyone ever explain to you what is -- is that another term, like you said, sitting by the phone, is expected to be at home, is that something that you've heard? |
| | A: I don't recall hearing that, you know, but I see it in writing. You know, I know you're supposed to keep your phone with you, I do know that, but as far as sitting at home, no. No. |
| | It's not something that I practice, you know. |
| Craig Dep. at 27:19-28:12. | Q: Are you aware of circumstances where a field service technician has worked more than 40 hours before the start of work on a Friday? |
| | A: Yes. |
| | Q: And what is the field service technician expected to do under that circumstance on regular work hours on Friday? |
| | A: If we're really not controlling overtime at that point, they can do whatever they had scheduled that day.  If we're really in a crunch on overtime and we're watching it, they would call their field service manager and see if there's anything that needs to get done that would be overtime approved. Otherwise they need to remain available. |
| Craig Dep. at 28:19-24. | Q: Do you agree that there is no written policy with regard to what a field service technician is expected to do during normal work hours on, say, a Friday or Thursday after already completing 40 hours of work? |
| | A: I agree. |
| Craig Dep. at 31:21-24. | Q: Have you ever seen a written policy with regard to what is expected of an FST after 40 hours? |
| | A: No. |

## <u>CERTIFICATE OF SERVICE</u>

I, Paul C. Lantis, hereby certify that on this 7th day of October, 2016, Defendant's Supplemental Brief in Support of its Motion for Summary Judgment was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel of record.


*/s/ Paul C. Lantis*
Paul C. Lantis